Next case we have this morning is 21-8078, 4th v. Laramie County School District. Counselor Appellant, if you would make your appearance and then please proceed. Good morning. May it please the Court. My name is Matthew Crone on behalf of Appellant Gracie Crone. The sexual abuse that occurred in this case is horrific, disgusting, tragic. No child, let alone a 14-year-old, should undergo this level of abuse, let alone at the hands of their teacher. But this sort of abuse happens more often than it should. And it happens as often in cases like this one because school officials fail to adequately protect their students, counter to Congress' goal in enacting Title IX. The District Court erred by finding that the school district lacked actual knowledge, i.e. a substantial risk of harm. Given the evidentiary record in this case, particularly when viewed in the light most favorable to the non-moving party, Plaintiff Appellant, the record contains ample evidence to show that the school district had actual knowledge. So, Counsel, let me just stop you there. So you concede you have to show actual knowledge. Yes, which, as this Court defined in SQ, is a substantial risk of abuse. Thank you. And when those warning signs were present here, in this case, and, you know, one of the principals had personally observed Mr. Meza sitting with a group of 7th grade girls, one of whom had her arm around him while she continually stroked his face and neck. And then teachers, the very next school year, reported incident after incident, complaint after complaint, to school principals. On that evidentiary record, a reasonable jury viewed that evidence in the light most favorable to Appellant. Is the evidence clear? Is the evidence clear exactly what the teachers reported to the principals? I mean, I understood the evidence about what the teachers suspected. It wasn't clear to me how much of that actually got reported to the principals. So what does the record show? I'd like to know the specific record about the reporting that occurred to the principals. Thank you, Judge Ebel. Well, first off, there is the personal observations from the principals themselves. And his observation of the football game. I'm sorry. That's not probably enough, but go ahead. Right. I'm sorry. Did that incident involve a girl here? No, it did not, Your Honor. So maybe tell us what that involved. Other people. Yes. I'm sorry as to which question. Let me answer Judge Ebel's question about the specific complaints, and then I'll return to the football game incident, if that's OK. Which is so teachers, Shannon Hall reported to the principals that Meza had come up to her and demanded a hall pass so that Gracie could visit him whenever she wanted, regardless of whether she was in class. And then Meza grew angry and threatening towards Ms. Hall when she denied that request. And she reported that incident to principals. Ms. Hall also reported incidents in which that Gracie was in Meza's classroom before school, after school. She was skipping classes to be in Meza's classroom. And she also reported that Meza had brought Gracie to school on a professional development day, which was a day for only teachers to be in the school location, and students were not supposed to even be in the building. Teachers, Shannon Hall and Rebecca Robinson also reported an incident in which Gracie and Meza were sharing. Reported to who? All of those reports that I were mentioning were reported to the school principals in this case. They were reported directly to Principal Hunter, and the record is somewhat muddled as to whether other principals also received those direct complaints. I believe the teachers testified that either Cunningham or Balow were in the room when they fielded the complaints, but they couldn't recall exactly who it was. Turning to your question, Judge I, and the football game involved a different seventh grade girl, and Mr. Meza was sitting with a group of seventh grade girls. And this happened the school year prior to the incidents involving Gracie. And so at that football game, Mr. Meza was sitting with one of the girls, had her arm around him as she was continually stroking her face and neck. And I think this is an incident where the district court really failed to view the evidence in the light most favorable to plaintiff appellant. And the district courts... You're conceding that that girl was not the plaintiff. I thought the evidence simply said that we didn't know who that girl was, but you're conceding it was not the plaintiff. Yeah, the evidence is that we don't know who it was, but it was not Gracie is my understanding. All right. But it involved another girl in her class. And so the district court failed to draw reasonable inferences. And I think I would direct the court to two reasonable inferences that you can glean from that report. One is that Principal Cunningham stated that, and this is from his notes directly, that the touching was continual. And that word is notably omitted from the district court's order. And the reason that word is so crucial is because it distinguishes it from accidental or fleeting touches. Like we're at issue in the Davis v. DeKalb case, which was cited by appellees. And you're talking specifically about the football incident. I'm talking about the football incident specifically. And so that was it was not an accidental or quick touch like a student initiating a hug. Continual touching is prolonged and it's purposeful. The other reasonable inference to draw from that incident, which went omitted by the district court, is that there is no indication that Mr. Meza got up. He walked away. He stopped the girl from touching him. And so at that point, it becomes not a student initiated thing, but a more mutual touching. Right. It becomes on purpose. He welcomed it and he encouraged it. OK, well, he there was a report made. He was counseled about boundaries, something put in his file. It happened a year before the events at issue here. So you've got to profess. I mean, you've got a teacher who has who was unaware of boundary problems. What we've got to get to is this is this actual knowledge standard. And on that point, one of the things that I think comes up in your brief is a reference to and I think you talked about it today. The fact that Gracie would spend time in his office while other students spend time in his office, too. Right. So, I mean, what what inference do we necessarily derive from that? I mean. Sure. Well, excessive time in of itself may be part of the actual knowledge puzzle, but does does not contend that it's a student spending time outside of class hours with the teacher by itself is sufficient under the actual knowledge standard. Rather, I would argue that it's a piece of the cumulative puzzle. And I would. And although there were some reports of other students spending time with Mesa in his classroom, there were five separate reports during her eighth grade year that were specific to Gracie herself. There was, I believe, one report that was sort of generalized commentary about Mesa spending time with students generally. But there were five distinct reports about Gracie and turning back to the football game. I don't believe that it is just a boundary issue. I view this and I think a reasonable jury could infer this as an act of sexual harassment, as other district courts have found that face touching can be deemed sexual in nature. Well, he wasn't touching her face. She was touching his face. And there was. Am I right on that? That was my understanding of how that played out, right? Yes. And she was touching his face. OK. And I'm not and I believe me, I'm not suggesting she was consenting or anything of that sort. That's not the point. My point, however, is that the principal treated that as an instance of him just not recognizing that properly as a teacher. He could. That wasn't something that he should be doing. So, I mean, that one incident a year prior, which didn't involve him actually aggressively doing anything to her. I mean, that makes gives for at least. Why is it that just an inference of bad judgment that could theoretically have gone corrected at that point? It might have, except we don't know. Well, first off, I think that Principal Cunningham was derelict in his lack of investigation into this. We have no explanation from as in the record as to why from Cunningham's observations as to why he was permitting, allowing this girl to do this and to your point that she what she was indeed the one that was touching him as opposed to. But I think and I think that would matter if the touching was fleeting or quick. But I think the prolonged nature of the touching differentiates it and makes that fact is who was touching who virtually negligible. You know, to the extent that the record cast doubt as to whether the school officials had actual knowledge. I think any doubt can be dispelled by Principal Hunter's conversation with the Garcia's at Cahill Park. And I want to set that scene for you in case it's a little unclear from the briefing as to the timeline, because this conversation occurred just days after Gracie had finally reported the abuse to police. And so and she at the police station, she had contacted her mother and she told so she told her family about what had happened. But Principal Hunter did not know. And nobody, nobody in the school district knew at the time of that conversation. And from when Principal Hunter, they had a mutual friend and she was asking how Gracie was doing and his face fell. People are very adept at reading emotions. And Principal Hunter's mind didn't jump to, oh, no, maybe Gracie got in a car accident. Or, you know, she had a bad breakup or some other calamity. Her Principal Hunter's mind went straight to Mesa and she discussed her alleged counseling efforts with him, saying that she talked to him over and over again. I think that there is contradictory evidence in the record on that point because she wasn't at the conversation where the idea of adoption came up. No, no, Your Honor, that is it. That is a different conversation. All right. Go ahead. And I'm not focusing as much on the adoption issue in this appeal. This is where I want. And I do. We've got the detour. We've got the detour of the adoption. Let's just put a nail on that. You're saying you're not focusing on it. I mean, I didn't know what to make of that. It's very odd for a principal to adopt a student. But you're you're telling this court that you're not relying on that so that we should not worry ourselves about it. Is that right? No, I'm sorry if I misspoke. And I would like to save some time for rebuttal as well. I know we're getting close here, but I think that the fact that he adopted her is part of the cumulative puzzle here. It goes to the actual knowledge standard. But I. But there was about a year and a half, two years after the adoption where we don't have the same sort of complaints in the record. And I think the importance of that is that Mesa was using the adoption as a smokescreen to cover up his relationship with Grace. And the principals knew. The principals knew about the adoption. The principals knew about the adoption, but they did not know that she had gone to the police and stated that Mesa was sexually abused. OK, but this conversation that you were referring to, and I'm sorry if I mix this up, but the conversation we're referring to that happened before the adoption. Then that conversation happened after the it happened after the adoption. But the adoption did not come up was not part of that conversation. So they connected the dots. Vince Garcia had stated he had an adopted daughter. Then based on that information, Principal Hunter asked, oh, it's not Gracie, is it? He said it was. She said, how is she doing? His face falls. She goes, he didn't. And then says he did. And then she says, I talked to him. OK, so adoption was within the confines of that conversation. Yeah, just in terms of making the connection as to who Gracie was. But, you know, this objective, I think the reasonable inference to draw from this conversation is that Principal Hunter subjectively suspected that Mesa was at risk. Defendants have not said that our interpretation of that conversation is speculative, but they've not offered any alternative explanation, nor do Principal Hunter's comments make any sense otherwise. And there's numerous courts that have found that although it's not a subjective standard for actual knowledge, but that subjective knowledge is highly relevant. And so, well, I'm out of time, but we'll allow some time. I would just sort of summarize the main point here is that if a principal personally believes that and has the knowledge in her head that a teacher poses a substantial risk to students, and I think the jury could certainly infer and find that the principal had that knowledge. Thank you. Thank you. Council. I'm Boyd Smith from Cheyenne, Wyoming, representing Laramie County School District number one. Well, Mr. Smith, what is the alternative explanation for that weird conversation in which the adoption came up and the reaction of the principal? I mean, if it were not suggestive of the fact that the principal had subjective awareness that something was going on improper, if it didn't mean that, what did it mean? The only subjective knowledge referenced by that episode was that of the adopted grandfather, Vince Garcia. He is the one he he's the one who's speculating as to what she thought. She didn't say that. And if you look at the testimony and I included that cross examination of Vince Garcia in my brief, he said it came up that he was the grandfather of Miss Forth. And she said, how are they? And according to him, he is his face turned ashen. And she said he didn't. And from that, he gleans that she subjectively meant he didn't have sexual relations with the plaintiff. That's that's his interpretation of her demeanor. She didn't say that. And in fact, her testimony, which I cite in the brief, was his testimony. He says in a separate page or so behind that or after that, he says she was very surprised to learn that he had been that Mesa had been accused of sexually abusing Miss Forth. That is what she said. I mean, that was the the knowledge. And she didn't. And then there's no evidence there of her subjective intent. It's his subjective. What did she say about the episode later? I assume she was deposed, right? I, you know, I don't know if her deposition, I don't remember the chronology might have been before the deposition of Mr. Garcia. So we don't have a reaction to the Garcia episode. We don't have her. I don't think we have that. Certainly not in the record. We have the the the key piece of evidence being that Garcia says. When she was told that in the park there that he may have been accused of sexually abusing Miss Forth, she was very surprised. That's the only evidence of what she knew, not not as reading, reading the TV space on her facial expression, which as an analogy, I would say that would be like me reading the court's demeanor and saying, I know what you're going to decide. You haven't told me that. I'm just guessing. And that's what he was doing. He didn't is upon first reflection, somewhat damning. I mean, I it suggests that he didn't do something he shouldn't be doing. I mean, and and to that point, let me let me just just go with the assumption for a second. And I'm clear. I'm just asking you to assume this. If let's assume that it was it did give rise to some imprints of subjective knowledge. How does that link with play into the actual knowledge standard? Well, it doesn't because it's it's a it's a speculation of subjective knowledge of a person. It doesn't show the district had actual knowledge of a substantial risk of abuse. But it wasn't. But she was she was a principal. She therefore wouldn't she be in some sense her her knowledge attributed to the district. If her knowledge, if she had knowledge of a substantial risk, that would be sufficient to be attributed to district. But be aware also of the time frame of this. This was in June of 2017, a few weeks after Mesa had been arrested and she didn't know about the rest. But this was I think she had left the Johnson Junior High a year or two before. She had not even been a principal at that school for some period of time. What authority do you have that actual knowledge requires more than a suspicion? Well, I think the the cases in this court and the Gebser decision from the United States Supreme Court requires that it be sufficient to supply actual notice of a substantial risk of harm. Yeah. So a suspicion could be I have actual knowledge. And my suspicion is that is causing harm to this victim and therefore a likelihood that that victim may be the word suspicion could apply either to the knowledge or to the consequences of that. And she might say, I have actual knowledge of things that I think were improper. And that's led me to a suspicion that something improper is happening. I can't say it's a confirmation of it because I haven't gotten a concession, a confession. But at that point, suspicion becomes much less troublesome. If it's only I have a suspicion that something happened, that's a different story. I mean, it's it's it depends on where the word suspicion comes up in the analysis, in the conclusion or in the underlying data. And this episode is removed as remote. And this is a several layers of inference to the plaintiffs insist that this court should be able to make to imply or infer actual knowledge. And to that, I would emphasize that the actual knowledge standard is a high bar. And that's been noted by the Gebser saying that it's a high bar. This is not it's not a negligence standard. It's not a should have known standard. It's not a constructed notice. It's definitely a high bar. And the court gets to talk about the policy reason for that, that there's a policy reason that there's a high bar for that. And they said that that is you find that. That the central purpose, the central purpose of requiring actual notice is to avoid diverting educational funding from beneficial uses, where the recipient was unaware of the discrimination as well as willing to take corrective measures. Had they been aware that that is the distinction. Yes. Reason for the high bar. Let me go with that and and take the jump off from that proposition. Assuming that's right. Well, why isn't there some support for risk? It's actual knowledge of a substantial risk of abuse. It's not. And so high bar or not, we're not talking about actual knowledge of abuse. We're talking about actual knowledge of the substantial risk of abuse. And and I'm just looking at some of these incidents, the special relationship incident in itself. Why didn't that set off alarm bells for somebody? You have a teacher going to somebody saying, I want her in my classroom whenever, you know, whenever she wants to be, because she and I have a special relationship. You add that and I could go through a number of these, including the ones where she's, you know, there on professional development day and that kind of thing. But if you just have that one and then you have drinking out of the same Coke, I'm sort of at a loss for saying why that would not set off alarm bells for something. Somebody that something is going on and something is going on of a sexual nature. Well, you know, again, I think that Judge Johnson got it correct. This is inappropriate, unprofessional, but regarding the time in the classroom. Excuse me. The Tina Hunter, the Christina Hunter principal testified that she did talk. She and another principal, I can't remember which one, talked to Meza about students being in the classroom. But she said it was not specific to Ms. Forth. It was that he had students, many students coming to his classroom, as was another teacher, Ms. Mazzoni. Yes. And that was the dialogue I had with opposing counsel. I get that. But the point is, by Meza's own characterization of his relationship with Ms. Forth, it was a special relationship. And so you add that to the Coke soda. I don't know whether it's Coke or not, the soda incident. And and the I understand your position that there's a high bar. But I what I'm trying to give me your best case to suggest, let's just take those two apart from all this. These all this movement in and out of his office. Let's just take those two. What case is what's your best case to suggest the alarm bells equal to notice of a substantial risk of abuse should not have gone off when they knew those two things? Well, the drinking out of a can of St. Pop, that's an odd thing, but it's not. Oh, it's odd. I don't think it's wacky. And I can picture that happening. I can see a coach in a football team doing that. I can see that kind of thing happening. So I don't think it's inappropriate. I think it's clearly inappropriate and shouldn't be the subject of counseling. And there was counseling given. I guess my point was that you add that in the special relationship. And again, I'm not talking about traffic in Mr. Meza's office. He could have been a real popular teacher for all I know. That's not my point. My point is he by his own characterization of what was going on between him and Miss Forth. They had a special relationship. So she wasn't like any other student. She was special. And so in that context, what I want to know from you, all I'm saying is what's your what's your hardest case to tell me? Oh, I don't there's nothing to worry about here. There's nothing to see those two incidents. Because she was a girl from some troubled family. I'm talking about judicial decision. If you have one. I'm not talking about it. I'm just saying. And I'm asking you for a judicial decision to help me know that those I shouldn't worry about those two things. I mean, I know you've cited cases in your brief, which which one would you tell me to look at to allay my concern about those two things? I don't think I can point to a brief where that those words were used or something of that nature was used. But we did point to a number of cases where behavior was perhaps raised eyebrows. But the ones where the courts have found actual knowledge, behavior was far more egregious in this case. And I point out none of that is gender or sexual in nature. Drinking out of the same Coke with somebody of another gender is not potentially sexual in nature. That's pretty intimate act, isn't it? I don't know. I guess I wouldn't see it as that. All right. But, you know, the other cases and we cited in our brief, I won't go through all of them. But the the conduct was much more egregious, including the Hilldale case. I know you were involved in where the teacher manager was observed by another student having a student goes to the hotel room door. The teacher opens the door and the student sees a female student lying on the band teacher's bed, goes to the administration's reports and says, I think that guy's a pedophile. I mean, that's the kind of egregious conduct that is found in the cases that where the court has found actual knowledge. Let me change the subject quickly. I think that everybody agreed that the discovery is completed. Nobody asked for nobody resisted a summary judgment motion because discovery hadn't been completed. Is that right? So it's not like you might find some more stuff if this case stayed alive for a while. I would point out to the court that this case went through exhaustive discovery, massive document discovery. I think we had 14 depositions, virtually every principal at the junior high was disposed. The school district administrator from the district human resources. So what we see, what we saw in summary judgment is what you'd see a trial. What do we take from the fact that some of the principals identified the conduct associated with Miss Mesa and Mr. Forth as grooming and they, by their own characterization, saw markers of the lead up to sexual conduct in that. At least that's my recollection that there were some statements in the record. You look quizzical. So perhaps I'm wrong. I'm not recalling those statements like that in the record. Really? OK. All right. I'd like to close with kind of giving a perspective on this. As we just discussed, there was exhaustive discovery in this case. And principals and teachers and administrators were deposed. And there are a handful of incidents brought up by plaintiffs, some of which clearly the administration never knew about. They didn't know about the out of town trips, running trips. They didn't know about the locker room joking by the coaches. They didn't know any of that. But what we have is we've scrutinized a massive record in hindsight. And plaintiffs essentially are asking this court to say to apply a should have known standard that there were some red flags. Well, sitting here today. Yeah, we can say it. Well, correct me if I'm wrong. Going to my last point, and I won't pursue it beyond asking this next question. I have in my notes, anyway, that Miss Cunningham testified that issued that issuing frequent passes. It passes to a particular student could be a, quote, sign of grooming. Did she not say that? She said that wasn't asked in terms of this. I believe that was asked as a hypothetical. Would you agree? Well, yeah. Well, even if it's not in terms of this student, the question is, what would be the attributes of his conduct that would have given rise to notice? Right. And if there are certain things that would have been innocuous in some on some planet other than ours. And but in the context of the educational setting, one would know that those are markers of grooming. Why? Why isn't that relevant to the actual notice? And now, again, it wasn't just her that was asking for passes. Other students. And it wasn't just his room was on his room. So maybe it was a little more out front. I just said it wasn't just her, but other students, too. Is there evidence of how many other students got special passes to his office? I don't hear the evidence of how many got special passes. There's evidence that there were requests for passes to his office. And there's evidence that students were in his room a lot, including, of course, because he was also a track coach. And so they had a reason to be there oftentimes. But there's that kind of involves in the evidence also. So anyway, this is looking at this massive record from hindsight. You know, there are some red flags, but again, that goes to a negligence standard. Is it a should have known standard? But it's not. If it was a should have known standard, it's a different, different outcome. Well, the should have known, as Chief Judge Holmes said, should have known is not that you should have known there was abuse. All it was was you should have known that there was a substantial risk of abuse. Correct. And that's what it should have known still. No, it should have known doesn't cut it. They have to have an actual, I mean, actual knowledge, but not of the abuse, only a substantial risk. I shouldn't have you sort of known except that you used it, so I just parroted it. So I did that to show that's not the standard. I agree. I agree. I agree. Going on, if you have something burning to say, I want to hear it, but otherwise I'll just finish with this. And we pointed it out in our briefing. The relationship went on in the marital home of Mesa for a year and a half, at least. And his wife did not know. Anybody should have known it was her. It shows how adept they were in this relationship, but yet they want to say that the school district should have picked up on something that she didn't even pick up on. Chief, may I ask one question? Chief? Of course you can. Just one quick question. Yes. When did he die? Is the evidence does the evidence show when he adopted her? When in this whole process, he adopted her? Yes, it does. And this is in the record. He moved into the Mesa's home. I mean, yeah, the Mesa's home in October of 2015. They were awarded guardianship in December of 2015. And the adoption became final in May of 2016. So she was living in that home from October 2015 until the date she went to the police in May of 2017. Oh, so awarded guardianship in December 2015. Did I hear you correctly? Correct. And then and then they got full adoption when? In May of 2016. OK, great. All right. Thank you. Thank you. All right. How much time does he have? Oh, by how much? OK, let's go with a good two minutes and that's going to be a hard two minutes. And, you know, I have to take it if you don't want it, but you got it. All right. I'm just going to bullet point a few of the factual issues here. There's no evidence that there were any special passes for any other students. There was testimony, as Judge Holmes pointed out, that his principals received training and they were trained to recognize many of the signs. The incidents that were here, they recognized it as grooming. They took no action with respect to the soda sharing incident. You know, I would emphasize that six students, middle school students reported this to their teachers. Reasonable inference. They weren't concerned about germs. This is pre-COVID went far beyond the boundaries of the normal student teacher conversation. With respect to Principal Hunter's. Could I ask six students to just refresh my recollection, six students separately? I think there's two groups of three students. OK, OK, OK, OK. The conversation in the park, I perhaps I missed it, but I still do not hear an alternative explanation for Principal Hunter's comments in the park. Well, this is what I want to know. I mean, is there anywhere in the record where Principal Hunter says what her reaction was to that? Explain to Principal Hunter. Did she? I believe she testified that she she did not deny having this conversation with the Garcia's. She didn't recall the contents much as she did not recall receiving any of the reports that the teachers made to her. So she did. She doesn't say that her reaction was was a result of any sort of knowledge. No, but she does not deny that either. And a reasonable jury can make a credibility determination based on this conversation. It was not just Vince Garcia as counsel led you to believe. Becky Garcia, Gracie's mother, also testified. She participated in this conversation and to her, Principal Hunter testified that or stated that she suspected it was a sexual issue. Your Honor, we're wrapping up. Thank you, counsel, for your very fine arguments. Both of you. Thank you.